UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| THE ESTATE OF ANGELA GOODIN, | ) | |
| Joseph Goodin, Executor, | ) | |
| JOSEPH GOODIN, and | ) | Civil No: 12-18-GFVT |
| TABITHA GOODIN, | ) | |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM** |
| | ) | **OPINION** |
| V. | ) | **&** |
| | ) | **ORDER** |
| KNOX COUNTY, KENTUCKY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon the Motion for Summary Judgment filed by

Defendants Knox County, Knox County Judge Executive J.M. Hall, and Knox County Jailer

Mary Hammons.  The facts of this case center on the death of Angela Goodin while she was

incarcerated in the Knox County Detention Center.  At issue is whether Knox County, Hall,

or Hammons violated the constitutional rights of Angela Goodin, or otherwise acted

negligently in connection with her death.

**I**

**A**

Mrs. Angela Goodin was arrested by the Barbourville City Police in Knox County,

Kentucky, on the evening of January 27, 2011, on a warrant for Trafficking a Controlled

Substance.  [R. 33-4.]  On the day of her arrest, Goodin had traveled with her daughter

Tabitha Goodin to Lexington, Kentucky, for a doctor's appointment.  [R. 35 at 21-22.]

Tabitha Goodin testified that she believed her mother had taken her usual prescription medication that morning, and that she did not believe her mother had had any alcohol on the day of her arrest, but that she had noticed her mother was shaking all that day and thought her mother was going into a seizure. [*Id*. at 24-25, 27.] Because Angela Goodin continued to shake while driving home that evening, Tabitha took over the driving. [*Id*. at 28.] They arrived back in Barbourville at about 7:00 p.m. and pulled into a Walmart parking lot, where they were stopped by five police cars. [*Id*. at 29.]

One of the arresting officers, Officer Senters, testified that the police had made controlled drug buys off of Angela Goodin "on a couple of different dates" before her arrest, and that on the evening of her arrest the police had been informed by a cooperating witness that she would arrive at the Barbourville Wal-Mart at a certain time. [R. 36 at 8-9.] Tabitha Goodin testified that the arresting officers searched Mrs. Goodin and also searched her purse. [R. 35 at 33.] According to Officer Senters, although the police found some Percocet in Mrs. Goodin's possession when they arrested her, they did not find the drugs they were looking for, and therefore Senters told Officer Robert Brown to make sure the jail personnel searched Goodin to see if they could find other drugs.[1] [R. 36-1 at 11.] Officer Senters also advised Brown that when police had conducted controlled buys from Goodin in the past, she had taken the contraband out of her bra, and that she should be watched closely. [*Id*.] Officer Brown asked Goodin if she was on any medication, to which she only stated that she had taken the prescribed Percocet. [*Id*.] Brown placed Goodin in his car but did not see her remove anything or place anything in his car. [*Id*.] The officers stated that at the time of her

---

[1] The Defendants' brief cites to pages 24-25 of Officer Senters' deposition when relating this information, but the deposition for Officer Senters filed in the record only contains nine pages. This information also appears to be contained in the Crime Supplement which is attached as an Addendum to Senters' Deposition at R. 36-1, and which is the document the Court uses here instead of relying on pages that the Court does not have and has not seen. The Plaintiffs do not dispute the facts related here.

arrest, Goodin did not appear to be under the influence or intoxicated at all. [*Id*.] Goodin also did not make any statements to the officers that would make them suspect she had taken any drugs other than her prescribed medicine. [*Id*.] Neither Senters nor Brown saw Goodin take any pills while she was in their custody. [*Id*.]

Brown took Goodin to the Knox County Detention Center and advised Booking Officer Nancy Foley that Goodin had hidden illegal drugs in her bra in the past and needed a strip search. [R. 36-1 at 11; R. 33-6.] In his Incident Report, Deputy Jailer Shelby Johnson confirmed that Brown told Foley that Goodin might have concealed pills on her person. [R. 33-14.] According to Officer Foley, she took Goodin into the property room where she conducted a strip search, and had Goodin take all her clothes off, lift each breast, squat, and cough three different times, but did not find any type of pills. [R. 33-7.] Foley asked Goodin if she had any drugs or alcohol in her system or if she had taken any that day, but Goodin replied that she did not. [*Id*.; R. 33-6.] Goodin asked for some water and told Foley that she had a fever and thought she had the flu, but said that she would be "okay." [R. 33-6.]

Goodin was booked into the Knox County Detention Center at approximately 9:22 p.m. on January 27, 2011. As part of the booking process, Officer Nancy Foley asked Goodin a series of questions which included a medical questionnaire. [R. 33-5 at 1.] Foley noted that Goodin did not appear to be under the influence of alcohol or drugs at the time of booking. [*Id*.] She also noted that Goodin did not show any signs of trauma or illness that would require emergency treatment, nor did she have any evidence of illness or infection that could spread through the jail. [*Id*.] When asked whether she was carrying medication, Goodin responded "no." [*Id*.] When asked if she was currently taking any medication, Goodin only listed medication for high blood pressure, and that she was taking "Klophin" for

3

a psychiatric disorder.  [*Id.* at 3.]  Goodin also responded "no" when asked if she had ever tried to harm herself or attempted suicide.  [*Id.*]

Angela Goodin was then placed in cell # 132, a detox cell for women.  [R. 33-11.] The jail's cell check records reflect that officers checked on Goodin each hour between midnight and 8:00 the next morning.  [*Id.*]  The last check was conducted at 8:00 a.m. on January 28, 2011.  [*Id.*; R. 33-8.]  Deputy Jailer Annette Lawson confirmed these checks in her Incident Report which stated that she performed hourly bed checks during her shift between 11:00 p.m. and 7:00 a.m.  [R. 33-13.]  Deputy Lawson further reported that between 5:30 and 6:00 a.m. on January 28, Lawson put another female prisoner into Goodin's cell, at which point Goodin woke up, raised up, and then laid back down.  [*Id.*]  At 8:10 a.m. on January 28, 2011, the Knox County Detention Center Activity Log reports that the other women in cell # 132 yelled out that Goodin was not breathing.  [R. 33-8.]  According to the Activity Log and the Extraordinary Occurrence Report filled out after Goodin's death, Officer Sheila Brown responded to the cries, along with several other officers, who put an ammonia inhalant under Goodin's nose.  [*Id.*; R. 33-12.]  When Goodin did not respond, Officer Brown called EMS at 8:13 a.m., and two other members of the staff immediately started C.P.R. which continued until the EMS arrived and transported Goodin to the hospital. [R. 33-8; R. 33-12.]  Coroner Michael Blevins pronounced Goodin dead at 8:30 a.m. [R. 33-19 at 4.]

The autopsy report concluded that Angela Goodin died from "Oxycodone Intoxication."  [R. 33-3 at 1.]  The examining physician's final diagnosis stated that there was a bag "with blue-white nondescript material" in Goodin's small intestine and that she swallowed the bag reportedly filled with oxycodone the previous day.  [*Id.* at 2.]  The

attached lab report confirmed that Goodin tested positive for oxycodone. [*Id.* at 10-11.] Jay Sowders of the Kentucky State Police prepared an Investigative Report, and was dispatched to the jail soon after Goodin was found unresponsive. [R. 33-1 at 4.] As part of his investigation, he questioned the other three women who had been in Goodin's cell that night – April Peters, Rebecca Brock, and Brittany Partin. All three of them told Sowders that Goodin did not appear to be under the influence when they were first in contact with her, but that Goodin had told them that she swallowed "a cigarette cellophane containing approximately 15 to 20 Roxicet 30 mg pills when she was stopped by police." [R. 33-19 at 5.] Partin told Sowders that Goodin had asked them not to say anything to the guards about the pills and that she was fine. [*Id.*] Each of them stated that Goodin had been snoring loudly through the night, and was still snoring at 7:15 a.m. when breakfast trays were brought to the cell, but that Goodin did not get up to eat breakfast. [*Id.*] Sowders concluded that Goodin died "as a result of an accidental overdose." [*Id.*] Goodin's husband Joseph Goodin and her daughter Tabitha both testified in their depositions that they suspected that Goodin had been addicted to prescription pain killers for several months before her death. [R. 34 at 46-50; R. 35 at 16-21.]

Plaintiffs never scheduled depositions for Defendants J.M. Hall or Mary Hammons, but the record reflects that they responded to Plaintiffs' discovery requests in the form of Interrogatories and Requests for Production of Documents. [*See* R. 33-20, R. 33-21, R. 33-22, R. 33-23.] Mary Hammons, the Knox County Jailer, was not present the evening when Goodin was booked, but she was present on the morning Goodin died. Hammons' response to the Interrogatories stated that she was in her office when she heard a commotion in the hallway, and that as she went out to see what was going on one of the deputies yelled to call

911.  After the EMS took Goodin from the jail, Hammons called the Department of

Corrections and the Kentucky State Police, and then began preparing an Extraordinary

Occurrence Report.  [R. 33-22 at 8.]  In her Extraordinary Occurrence Report, Hammons

stated that "[e]verything was done to prevent this from happening.  Procedures were followed

and documented."  [R. 42-6 at 2.]  She then included the following summary of the incident:

1. Cells checked at 8:00 a.m. everything was okay.
2. Woman in Cell 132 hollered "This girl has stopped snoring.  She's not breathing!"
3. We ran to cell 132 to check her.  There wasn't any response.
4. Inside we used an ammonia inhalant under her nose.
5. Immediately started C.P.R.  (Homer Tuttle, Hobert Davis)
6. Immediately Shelia Brown called E.M.S. at 8:13
7. C.P.R. was continued until E.M.S. arrived.
8. County Judge and County Sheriff were both at the jail as soon as they heard the E.M.S. call.

[R. 33-12 at 2; 42-6 at 2.]  Hammons also noted that there is video footage of Goodin at the

time she was booked into the jail which shows Goodin "was in no apparent distress and was

able to ambulate and obey commands."  [R. 33-22 at 9.]

Defendant Hall has been the Knox County Judge Executive since 2007.  As the Judge

Executive, he is the chief administrative officer and oversees the Knox County Fiscal Court.

[R. 42 at 1.]  In his response to the Interrogatories, Hall stated that "the day to day operations

of the jail are overseen by the jailer."  [R. 33-20 at 3.]  The Knox County Fiscal Court

provides funding for the Knox County Detention Center, approves the hiring and firing of jail

employees, approves jail policies, and is responsible for ensuring that jail policy complies

with Kentucky statutory regulations.  [*Id*. at 3-4, 6.]  Hall had no personal contact with

Goodin or personal knowledge of her during her incarceration.  Hall arrived at the jail before

Goodin was transported by EMS, but otherwise had no personal involvement with Goodin's

incarceration, nor did he know which individual jail employees were directly involved.  [*Id*.

at 4-7.]  As for Knox County Jail policies, Hall stated that the Fiscal Court adopted the jail's

operating policy in 2008, and there have been no revisions or amendments to the policy since

that time.  [*Id*. at 5.]

The Inmate Procedure Manual for the Knox County Detention Center requires

detention officers to "conduct a visual inspection of each cell area" and check each inmate at

least once every hour.  [R. 42-2 at 1.]  For inmates requiring "special surveillance," the

Manual instructs jail personnel to "conduct and document direct in-person surveillance a

minimum of every twenty (20) minutes."  [*Id*.]  As listed by the Manual, the following

classes of inmates require "special surveillance": suicidal, assaultive, escape risk, mentally or

emotionally disturbed, inmates in segregation, and inmates in detoxification areas.  [*Id*.]  This

requirement is consistent with Kentucky's regulations for administration of jails.  *See* 501

KAR 3:060.

**B**

The Estate of Angela Goodin, her husband Joseph Goodin, and her daughter Tabitha

Goodin brought suit in this Court against the Defendants in January 2012, pursuant to 42

U.S.C. § 1983, alleging that Defendants violated Angela Goodin's constitutional rights under

the Fourth, Fifth, Eighth, and Fourteenth Amendments by exhibiting deliberate indifference

to her serious medical needs and by a failure to properly train and supervise employees at the

Knox County Detention Center.  [R. 1 at 5-6.]  Count I of the Complaint alleged that Mrs.

Goodin's death was a result of a continued pattern of misconduct on the part of the Detention

Center and of the policies, procedures, customs and practices of Knox County and its

Detention Center or Mary Hammons as jailer, which constituted deliberate indifference to

Goodin's constitutional rights.  [R. 1 at 9.]  Count II alleged that the Defendants deprived

Goodin of her Fourth, Fifth, Eighth, and Fourteenth Amendment rights [*Id*. at 10], and Count IV alleged that these constitutional deprivations resulted from a failure to train or supervise on the part of the County and Ms. Hammons. [*Id*. at 12.] The Complaint also included state law claims for negligence, wrongful death, and loss of consortium. [*Id*. at 11-15.] Finally, Plaintiffs seek punitive damages for all their claims, as well as injunctive relief. [*Id*.]

The Defendants responded by filing a motion to dismiss, and in May 2013, this Court granted the Defendants' motion to dismiss in part and denied it in part. [R. 11.] The Court granted the motion by dismissing all federal and state law claims against the Defendants in their official capacities; all federal and state law claims against Knox County Detention Center; all claims against Defendant Bill Mills in his official and individual capacities; and all federal claims for punitive damages against Knox County. [R. 11.] The Court denied the motion as to the remaining claims. After completing discovery, the remaining Defendants – Knox County, Hall, and Hammons – now move the Court to grant summary judgment in their favor as to the remaining claims. Such claims include the following: both the federal claims and the state law claims for punitive damages against Hammons and Hall in their *individual* capacities; the federal claims against Knox County; and the claims for injunctive relief against all Defendants in their official capacities.

## II

### A

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a

material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

In applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 255). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the

record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

## B

The primary claim brought by Goodin's Estate concerns an alleged violation of her constitutional rights. Such allegations, as well as allegations concerning a failure to train, are properly brought under 42 U.S.C. §1983. Section 1983 does not create substantive rights but, rather, "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States. . . ." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924 (1982); *Mertik v. Blalock*, 983 F.2d 1353, 1359 (6th Cir. 1993). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989) (additional citations omitted)).

In specifying the constitutional rights at issue, it is necessary to clarify that Goodin was a pretrial detainee at the time of her death, and therefore her constitutional claims are properly analyzed under the Fourteenth Amendment rather than the Eighth Amendment.[2] The Eighth Amendment applies to those who are incarcerated after conviction, and thus does not apply in this context. *Graham v Connor*, 490 U.S. 386 (1977). However, both the Sixth Circuit and the United States Supreme Court have found that the Fourteenth Amendment's due process clause affords pretrial detainees "a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Harbin v. City of Detroit*, 147 F.

---

[2] Although the Complaint also lists the Fourth and Fifth Amendments, Plaintiffs have at no time alleged any facts or legal arguments connected to those Amendments. All of Plaintiffs' constitutional arguments are properly brought under the Fourteenth Amendment as explained above.

App'x 566, 569 (6th Cir. 2005) (citing *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003)).  Whether the claim is brought under the Eighth or Fourteenth Amendment, "[w]here prison [or jail] officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment . . . ." *Vaughn v. City of Lebanon*, 18 Fed. App'x 252, 272 (6th Cir. 2001) (quoting another source).  Consequently, Plaintiffs' claim of deliberate indifference to Goodin's medical needs is properly brought under the Fourteenth Amendment, but is analyzed under the same standards employed in evaluating Eighth Amendment claims concerning cruel and unusual punishment.  *Bell v. Wolfish*, 441 U.S. 520, 535, 545 (1979); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001).

## C

### 1

According to Plaintiffs, even though jail personnel knew Angela Goodin was in possession of drugs at the time of her arrest, yet found no drugs on her person, they failed to put her on any heightened supervision.  [R. 42 at 3.]  Plaintiffs contend that given this situation, Goodin should have been checked on more frequently than once per hour, and that more extensive measures should have been taken to prevent her from dying from a drug overdose.  [R. 42 at 5-8.]  In moving for summary judgment, Defendants argue that regardless of the frequency of cell checks, there is no evidence that any named Defendant exhibited deliberate indifference to Goodin's medical needs, and that each Defendant is entitled to qualified immunity on Plaintiffs' claims.  [R. 33-1 at 21-36.]

Federal qualified immunity  "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). When evaluating such claims, courts generally apply a two-step analysis. First, the court must consider whether "[t]aken in a light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court asks whether the right at issue was "clearly established." *Id.* "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). "The burden of convincing a court that the law was clearly established rests squarely with the plaintiff." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (citation and internal quotation marks omitted). Although at one time courts were required to follow these steps sequentially, the Supreme Court has abandoned that position and now permits courts to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Here, Plaintiffs fail to meet the standard for showing that Goodin's constitutional rights were violated at all. To succeed on a claim of deliberate indifference to medical needs, Plaintiffs must show first that Goodin had "an objectively substantial risk of serious harm," and second, that the jail or county officials were "subjectively aware of the risk." *Harbin v. City of Detroit*, 147 Fed. App'x 566, 570 (6th Cir. 2005) (citations omitted). That is, the Defendants must have a culpable state of mind --- the official must know of and disregard an

"excessive risk to [detainee] health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

To satisfy the objective component, a detainee's subjective feelings of pain, "if sufficiently egregious," coupled with a denial of medical care can serve as evidence of an objective injury. *Vaughn*, 18 F. App'x at 275 (quoting *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001)). The medical needs, however, must be "so patent as to make lay persons . . . remiss in failing to arrange for immediate medical attention." *Id.* (quoting other sources). Moreover, the medical needs must "arise from an injury or illness so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899-900 (6th Cir. 2005) (internal quotations and punctuation omitted). Stated another way, Goodin's serious medical need – here, the fact that she had ingested a large number of pills – must have been so obvious that any lay person would be "remiss in failing to arrange for immediate medical attention." *Id.*

On the facts presented, however, Plaintiffs have not shown that anyone even suspected that Goodin was under the influence of drugs, let alone that it was obvious to anyone that she required medical attention. None of the arresting officers, the booking officers, the deputy jailers, or even the other inmates in Goodin's cell,[3] suspected that Goodin was under the influence. They all testified that she did not appear to have taken any drugs or to be otherwise intoxicated. The only possible clue that Goodin had any medical needs at all was her statement to Foley that she had a fever and might have the flu – a statement that would not make the dangers of a possible drug overdose obvious to any lay person. Plaintiffs seem to imply that because the arresting officers expected to find drugs on Goodin but did

---

[3] Goodin's cellmates stated that they knew Goodin had ingested drugs only because she had told them that she did, but that she "did not appear to be under the influence at their first contact." [R. 33-19 at 5.]

not find any, and because they knew she had hidden drugs in her bra in the past, that either the police officers or Officer Foley should have suspected that Goodin had already ingested the drugs and perhaps tested her for them or at least checked on her more frequently.[4]  Such a theory, however, would have required jail personnel to have made far too many assumptions for Goodin's medical needs to qualify as obvious under the required legal standard explained above.  Moreover, the fact that Goodin exhibited no symptoms of having ingested any drugs precludes any contention that her condition was objectively serious.

For the sake of argument, however, even if jail personnel had suspected the possibility that Goodin had ingested oxycodone, Plaintiffs also fail to establish the subjective component of a deliberate indifference claim – that is, the plaintiff must also "establish that the defendants acted with 'deliberate indifference to serious medical needs.'"  *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  "Deliberate indifference is not mere negligence.  Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm . . . .  It is not enough that there was a danger of which an officer should have been aware . . . ."  *Id*. (citing *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994)).

Here, Plaintiffs fail to point to any facts even suggesting that anyone involved, let alone the actual Defendants in this case, were *subjectively* aware that Goodin had ingested a large quantify of drugs, or had a *culpable* state of mind in failing to obtain medical treatment for her.  *See Farmer*, 511 U.S. at 837.  The arresting officers suspected Goodin might be hiding drugs on her person, but none of the facts presented show that anyone knew she had actually ingested those drugs.  The arresting officers made sure that Officer Foley conducted

---

[4] The Court notes that none of the arresting officers, the booking officers, or any jail employees are named as Defendants in this case.

a strip search and that she looked carefully for any drugs hidden on Goodin's person.[5]  [R. 33-7; R. 33-6.]  Goodin was asked a number of times by several people whether she had ingested any drugs or alcohol, to which she responded "no" each time except for acknowledging that she had taken her prescription drugs. [*Id*.]  Goodin also did not display any symptoms suggesting she was under the influence of illegal drugs.

In a similar case where a pretrial detainee died of a drug overdose while in custody, the Sixth Circuit found that it was "not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies *should have known* that [the detainee] had swallowed drugs." *Watkins*, 273 F.3d at 686.  In that case, the court particularly noted that the detainee had not told the officers that he had swallowed any drugs even when they asked him, and that he did not request medical treatment.  *Id*.  Because the officers did not subjectively know he had any medical needs, they did not violate his constitutional rights by failing to obtain treatment.  *Id*.  Similarly, Goodin did not tell anyone she had swallowed any drugs, nor did she request medical treatment.  Thus, Plaintiffs have not established that anyone exhibited a deliberate indifference to Goodin's medical needs such that a deprivation of her constitutional rights occurred.

Most importantly, the remaining Defendants in this case include Hammons and Hall in their *individual* capacities.  Because the claims against Hammons and Hall in their *official* capacity have been dismissed, the remaining claims against them can only be established based on evidence of their personal involvement in violating Goodin's constitutional rights. Supreme Court precedent is clear that a government official can only be personally liable for a §1983 claim if he personally "caused the deprivation of a federal right." *Kentucky v.*

---

[5] Although Plaintiffs possibly imply that the search and booking processes were perhaps deficient, the Court notes that given the fact that Goodin ingested the drugs prior to booking (and probably prior to arrest), jail employees would not have discovered the pills no matter how thoroughly she was searched.

*Graham*, 473 U.S. 159, 166 (1985).  Otherwise stated, "[b]ecause § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability."  *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) (citing *Taylor v. Mich. Dept. of Corr.*, 69 F.3d 76, 80-81 (6th Cir. 1995)).  Here, even if any of the arresting officers or jail personnel did anything wrong in connection to Goodin's detention,[6] the facts presented do not even suggest that Defendants personally violated Goodin's constitutional rights.

Neither Hall nor Hammons were at the jail when Goodin was arrested, searched, booked, or monitored.  Hall only came to the jail after EMS had been called, and until that point had no personal knowledge of Goodin's incarceration or any of the circumstances surrounding her unfortunate death.  [R. 33-20 at 4-6.]  Although Hammons was at the jail when Goodin was found unresponsive, Plaintiffs point to no evidence that Hammons' actions at the time of Goodin's death exhibited a deliberate indifference to her medical needs.  Quite the contrary, when alerted to the fact that Goodin was not breathing, Hammons responded quickly and appropriately, as far as the Court is aware.  [*See* R. 42-6.]  Hammons made sure that C.P.R. was done and EMS was called, and she filled out the Extraordinary Occurrence Report documenting the event.  [*Id.*]  Plaintiffs identify nothing that Hammons should have done differently, other than to imply that she should have ensured that jail employees checked on Goodin more often during the night.  Plaintiffs attempt to argue that Hammons and Hall were personally involved in Goodin's death because Hammons was present the morning Goodin died and was involved in responding to the emergency, and because Hall came to the jail when he heard the EMS call.  [*See* R. 42 at 5-6.]  There is nothing about such

---

[6] The Court is not implying that any of these people acted illegally or unconstitutionally, but is merely clarifying that their behavior is ultimately not at issue here because none of them are parties to this lawsuit, and because Hammons and Hall cannot be held individually liable on the basis of a supervisory role.

actions, however, that would demonstrate Hammons or Hall had subjective knowledge that Goodin had ingested illegal drugs or that they were deliberately indifferent to the risk of her dying from an overdose.

Personal liability for Hammons and Hall also "cannot be based solely on the right to control employees." *Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993). When an official is not directly involved, as is the case here, a plaintiff alleging liability for failure to supervise his subordinates must "[a]t a minimum . . . show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id*. (citation omitted). As explained above, there is no evidence in this case that Goodin's constitutional rights were violated at all. Yet even if there were, there is no evidence that Hammons or Hall had any personal involvement in such violations or that they implicitly authorized or knowingly acquiesced in such alleged violations,[7] and thus they cannot be held liable in their individual capacity on Plaintiffs' deliberate indifference claim.

**2**

Plaintiffs primarily argue that Goodin's death resulted from a failure to train or supervise on the part of Knox County, Hammons, and Hall. More specifically, Plaintiffs assert that Defendants should be held liable based on the allegation that they implemented and authorized substandard policies for checking on inmates in the detox cell and on the failure to properly train jail employees in caring for inmates' medical needs. [R. 42 at 5-7.] Plaintiffs claim that, as supervisory officials, Defendants, and particularly Mary Hammons, should be held liable for "encourag[ing] the specific incident of misconduct." [R. 42 at 5.]

_____

[7] While Plaintiffs contend that the failure to check Goodin more than once per hour despite the Manual's instructions to check inmates in detox cells every twenty minutes constituted a violation of Goodin's constitutional rights, Plaintiffs have not shown how such an oversight meets the legal standard for a deliberate indifference claim, nor do they present evidence that Hammons or Hall authorized or acquiesced in the decision not to check Goodin more frequently.

As an initial matter, the Court has already explained that the evidence presented does not establish that there was any misconduct such that a violation of Mrs. Goodin's constitutional rights occurred. Federal courts have found in similar situations that prison officials "do not have to (1) send every intoxicated person to the hospital; (2) do not have to be mind readers, and (3) can take a prisoner at their word when they say they did not take drugs and do not need healthcare." *Smith v. Pike Cnty., Kentucky*, 2008 WL 3884331, at *7 (E.D. Ky. Aug. 18, 2008) (citing *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999)). The Sixth Circuit has also rejected arguments that jail officials should "take all chemically impaired persons to the hospital," and that a failure to take intoxicated detainees to the hospital "does not even constitute negligence, let alone deliberate indifference." *Id*. at *9 (citing *Estate of Abdel-Hak v. City of Dearborn*, 1989 WL 33097, at *2 (6th Cir.Apr. 6, 1989) (unpublished)). Here, Goodin not only denied ingesting any illegal drugs, but she also did not exhibit any symptoms of having done so. As has already been explained, there is no evidence of deliberate indifference on the part of the Defendants or any of their subordinates – and if there is no underlying constitutional violation, the Defendants cannot be held liable under § 1983 on a theory of a failure to train. *See Watkins*, 273 F.3d at 687.

Even if there were a possible constitutional violation, however, Plaintiffs have not met the standard required to establish a § 1983 claim based on a failure to train. In order to prevail on a claim for failure to train, "the plaintiff must prove . . . that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992) (internal quotations omitted) (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir.

1989); *City of Canton*, 489 U.S. at 388); *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).  Under the first factor, "the court is to examine particular deficiencies in the municipality's training program." *Lee v. Metro. Gov't of Nashville and Davidson Cnty.*, 596 F.Supp.2d 1101, 1124 n.15 (M.D. Tenn. 2009) (citing *City of Canton* and *Ellis*).  In regard to the second factor, the Sixth Circuit has identified two situations in which a finding of deliberate indifference is appropriate. *Id.* at 1124.  One "is where the city fails to act in response to the repeated complaints of constitutional violations by its officers." *Cherrington v. Skeeter,* 344 F.3d 631, 646 (6th Cir. 2003).  The second situation involves "a failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction." *Id.* (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).  Finally, to determine whether inadequate training was "closely related to" or "actually caused" the constitutional injury, the Supreme Court in *City of Canton* considered whether "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *City of Canton*, 489 U.S. at 391.

Here, Plaintiffs have not even referenced this standard nor provided evidence to support any of the three required elements.  First, Plaintiffs have not pointed to a particular deficiency in the training of Knox County employees or the Detention Center employees.  The standard of §1983 liability for a county or city "will not be satisfied by merely alleging that the existing training program for a class of employees . . . represents a policy for which the city is responsible." *City of Canton*, 489 U.S. at 389.  To meet their burden, Plaintiffs must provide the Court with evidence of an actual deficiency in the training program, and must show the Court that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the failure to

include such training amounts to deliberate indifference on the part of the city or county's policy makers. *Id.* at 390.

Yet here Plaintiffs do not present evidence of what the Knox County training program consists of. Instead of pointing to a particular deficiency in the training program, Plaintiffs merely assume that training must have been inadequate because the cell check record reflected that jail personnel checked on inmates in Goodin's detoxification cell only once an hour instead of every twenty minutes as required by both the Jail Manual and by the applicable state regulation, *see* 501 KAR 3:060, and that Defendants must be responsible for that inadequacy. Plaintiffs contend that the fact that this requirement of checking inmates in detox cells every twenty minutes was not followed is evidence of an unconstitutional policy at the jail which Hammons and Hall implicitly allowed or otherwise encouraged.[8] [R. 42 at 10-12.] Apart from further evidence of the actual training program, however, the cell check record may reflect more on the actions of individual deputies rather than on the training program itself. The Supreme Court has explained it is not enough "to prove that an injury or accident could have been avoided if an officer had had better or more training. . . ." *City of Canton*, 489 U.S. at 391. The fact that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id*. at 390-91 (internal citations omitted). Such liability will not attach where "an otherwise sound program has occasionally been negligently administered," or where "an injury or accident could have been avoided if an officer had had better or more training." *Id*. at 391.

---

[8] Curiously, neither party addresses why Goodin was placed in a detox cell. The facts presented do not show anyone suspected that she was intoxicated, or that the others in her cell were necessarily intoxicated, and thus there may have been another reason for putting her there. Regardless of the reason, however, Plaintiffs' § 1983 claims still fail for all the reasons explained herein.

Second, liability of a city, a county, or county officials under §1983 on a theory of failure to train may only be imposed "where such failure to train amounts to deliberate indifference toward a detainee's serious needs for medical care." *Blackmore*, 390 F.3d at 900; *see also City of Canton*, 489 U.S. at 389. Unsupported allegations concerning inadequacy of the training or the potential negligence of employees will not suffice. *See City of Canton*, 489 U.S. at 389-90. Here, as explained above, Plaintiffs have not presented any factual evidence of deliberate indifference on the part of Knox County or its policymakers, and thus cannot establish the second required factor.

Third, as to the alleged inadequacy causing the constitutional injury, even if Goodin had been checked on every twenty minutes instead of every hour, there is no evidence to suggest that doing so would have prevented her death. The cell log shows she was checked on at 8:00 a.m., but the record reflects that she was found unresponsive at 8:10 a.m. and that EMS was called at 8:13 a.m., which is less than twenty minutes past 8:00 a.m. [R. 33-8 at 4.] Thus, the evidence presented does not show that checking on Goodin every hour instead of every twenty minutes caused her death.

Despite their inability to establish any of the required factors for a failure-to-train claim, Plaintiffs further assert that Hall and Hammons actually "implement[ed] and adopt[ed] a substandard policy" of only checking intoxicated inmates once each hour [R. 42 at 5], and that Hammons in particular "clearly authorized the pervasive and lax supervision of inmates in detox cells." [R. 42 at 6.] Plaintiffs, however, provide absolutely no evidence to support any of these assertions. Nothing in the record shows there was a pervasive policy of

improperly supervising intoxicated inmates,[9] nor does the record suggest that Hammons authorized any sort of lax supervision of inmates.  Such assertions are not supported by even "a scintilla of evidence," let alone "evidence on which [a] jury could reasonably find for the plaintiff," *Anderson*, 477 U.S. at 252, and therefore are not enough to defeat summary judgment.  *See Hall Holding*, 285 F.3d at 424.

Once again, it is important to focus on who the actual defendants are in this case. As with the claim for deliberate indifference, government officials such as Hall and Hammons cannot be held individually liable on a theory of failure to train unless they personally "caused the deprivation of a federal right."  *Graham*, 473 U.S. at 166; see also *Miller*, 408 F.3d at 817 n.3 ("[b]ecause § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability").  Plaintiffs argue that Hall and Hammons should be held personally responsible because they ultimately had the responsibility to ensure that jail employees were properly trained.  However, in cases where the supervisor is also the policy-maker, which has been implied in this case, for individual liability to attach on a failure-to-train-or-supervise theory, the defendant "must be found to have 'encouraged the specific incident of misconduct or in some other way directly participated in it.'"  *Essex*, 518 Fed. Appx. at 355 (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)).  Here, despite Hall's position as Judge Executive and Hammons' position as Jailer, Plaintiffs have presented no evidence that either Hall or Hammons knew that jail personnel did not follow the Manual's instructions, much less that they *encouraged* employees to disregard the Manual.

---

[9] If anything, the Manual shows the jail had a policy consistent with the state regulation.  The fact that this policy was not followed one night for an inmate who did not appear intoxicated is not enough evidence to establish a pattern or policy such that Plaintiffs can prevail on a §1983 claim.

Finally, since Plaintiffs have not established that a violation of Goodin's constitutional rights occurred, the Court must also grant summary judgment to Knox County. Even if the failure to check on Goodin more frequently represented some inadequacy in Knox County's training program, the proper inquiry is "whether such inadequate training can justifiably be said to represent 'city policy.'" *City of Canton*, 489 U.S. at 390. Thus, a county can only be "liable under section 1983 if a constitutional violation results from an official policy or custom of that county." *Sours v. Big Sandy Reg'l Jail Auth.*, 946 F. Supp. 2d 678, 688 2013 WL 2322771 (W.D. Ky. 2013) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978)). Yet here Plaintiffs have not established that a constitutional violation even occurred. Even if the training of jail personnel was inadequate, Knox County "cannot be held liable without an underlying constitutional violation by the individual defendants." *Id*. at 688 (citing *Watkins*, 273 F.3d at 687). Indeed, "[i]f the individual defendants have violated no constitutional right, the municipality cannot be liable under §1983 for a failure to train." *Cooper v. Cnty. of Washtenaw*, 222 Fed. Appx. 459, 473 (6th Cir. 2007).

Thus, because the Court finds there is no underlying constitutional violation on the part of any Defendant, they are entitled to qualified immunity concerning all of Plaintiffs' federal claims. "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what Defendant is doing violates federal law in the circumstances." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999). Here, Plaintiffs have pointed to no pre-existing law that would dictate that under the circumstances presented, Defendants violated federal law by not taking Goodin to a hospital, searching her more thoroughly, or checking on her more frequently. Because there is no evidence of any

deliberate wrongdoing such that Plaintiffs can sustain their claims of Fourteenth Amendment violations on the part of any named Defendant, summary judgment must be granted in favor of Hammons, Hall, and Knox County on all claims brought under §1983.

## D

### 1

The Defendants also move for summary judgment on Plaintiffs' state law claims against Hall and Hammons in their individual capacities, and against Knox County, contending that Hammons and Hall were not directly involved in Goodin's death and cannot be held liable for any negligence on the part of their subordinates, if indeed there even was any negligence. [R. 33-1 at 35-36.] Moreover, Defendants contend that Hall and Hammons are entitled to qualified immunity on Plaintiffs' state law claims, and that Knox County is entitled to sovereign immunity because Kentucky has not waived its immunity for suits of this nature. [*Id*. at 36-38.]

First, the parties are correct[10] that "Kentucky counties are cloaked with sovereign immunity. . . by virtue of a Kentucky county's status as an arm or political subdivision of the Commonwealth." *Lexington-Fayette Urban Cnty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004) (internal citations omitted). Because Knox County is immune from tort suits such as claims concerning negligent operation of a jail, and suits for violations of administrative regulations, all of Plaintiffs' state law claims against Knox County will be dismissed. *See Commonwealth v. Harris*, 59 S.W.3d 896, 899 (Ky. 2001); *see also Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001).

Second, Defendants are correct that "[p]ublic officials are responsible only for their own misfeasance and negligence and are not responsible for the negligence of those who are

---

[10] Plaintiffs also acknowledge that Knox County is entitled to sovereign immunity in this case. [R. 42 at 9.]

employed by them." *Franklin Cnty. v. Malone*, 957 S.W.2d 195, 199-200 (Ky. 1997),

*overruled on other grounds by Com. v. Harris*, 59 S.W.3d 896 (Ky. 2001) and *overruled on*

*other grounds by Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001). Thus, as public officials,

neither Hammons nor Hall can be individually liable for the negligent actions of their

subordinates "unless they ratify or participate in the tortious act." *Id*. at 199. Although

Plaintiffs allege that Defendants did ratify and participate in a tortious act "by implementing

a substandard supervisory policy at the Jail" [R. 42 at 9], Plaintiffs present no evidence of

this allegation. Even if the deputy jailers should have checked on Goodin more frequently,

Plaintiffs present no evidence indicating that Hammons or Hall instituted or authorized a

policy of not checking on inmates as frequently as required. Hammons and Hall cannot be

found negligent without "proof of personal wrongdoing," *Franklin Cnty.*, 957 S.W.2d at 200,

yet the record does not reflect any evidence suggesting such wrongdoing by either

Defendant.[11] Even if Hammons or Hall could be vicariously liable as public officials, there

is no evidence in the record to support that a tortious act was even committed.

Moreover, concerning Defendant Hammons' liability, the Kentucky Supreme Court

has found that "[a] jailer cannot be charged with negligence in failing to prevent what he

could not reasonably anticipate," and that a "jailer is not an insurer of the safety of the

prisoners under his control." *Franklin Cnty.*, 957 S.W.2d at 200 (determining that a jailer

could not be held individually liable when there was "no evidence presented of any

negligence or deliberate wrongdoing on the part of the official jailer"). Here, Plaintiffs have

not established that Hammons could have reasonably anticipated that Goodin would die of a

---

[11] Although Plaintiffs also imply that Hammons was somehow negligent by her involvement in directing the
emergency care and response on the morning of Goodin's death [R. 42 at 8], Plaintiffs point to nothing in the
record suggesting that Hammons' actions contributed to Mrs. Goodin's death in any way.

drug overdose when neither she nor any other jail personnel knew Goodin had ingested drugs.

Additionally, Defendants Hall and Hammons are entitled to qualified official immunity on Plaintiffs' state law claims because "the supervision of prisoners is a discretionary act and entitles those in that position to qualified immunity." *Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 636, 640 (Ky. Ct. App. 2011) (citing *Rowan Cnty. v. Sloas*, 201 S.W.3d 469 (Ky. 2006)). Once an act is determined to have been performed within an official's discretionary authority, "the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act [was in bad faith]." *Rowan Cnty.*, 201 S.W.3d at 481. To do so, the Plaintiffs must show there was "some implication of self-interest, or a deliberate indifference, or sinister motive, rather than an honest mistake or oversight." *Id*. at 485. As explained above, Plaintiffs have not shown any deliberate indifference or sinister motive on the part of Hammons or Hall, and thus they are both entitled to qualified immunity on Plaintiffs' tort claims.

## 2

Defendants are also entitled to summary judgment on Tabitha Goodin's claim for loss of consortium because Tabitha Goodin is an adult child. The Kentucky Supreme Court has not definitively recognized loss of consortium claims for adult children, but other federal district courts interpreting Kentucky law have barred such claims in reliance on two Kentucky Court of Appeals cases that also precluded adult children in Kentucky from recovering for loss of parental consortium. *See, e.g., Donais v. Green Turtle Bay, Inc.*, 2012 WL 399160, at *3 (W.D. Ky. Feb. 7, 2012) (citing *Smith v. Vilvarajah*, 57 S.W.3d 839 (Ky. App. 2000) and *Clements v. Moore*, 55 S.W. 3d 838 (Ky. App. 2000)); *Treadway ex rel.*

*Estate of Spencer v. United States*, 2005 WL 2304747, at *1 (E.D. Ky. Sept. 21, 2005) (citing

the same). Based on such precedent, this Court also finds that adult children cannot bring

loss of parental consortium claims.

While Plaintiffs acknowledge that Kentucky law does not recognize loss of

consortium claims for adult children, Plaintiffs protest they are not aware of how old Tabitha

Goodin was at the time of her mother's death. [R. 42 at 13.] Plaintiffs also state that they do

not object to dismissing this claim if Tabitha was over eighteen when Mrs. Goodin died.

[*Id*.] Defendants, however, correctly point out that Tabitha Goodin testified that she was

twenty years old at the time her deposition was held on December 18, 2012. [R. 44 at 11.]

Based on that information, even without knowing the exact date of Tabitha's birth, she could

not have been under the age of eighteen when Angela Goodin died on January 28, 2011.

Accordingly, Tabitha Goodin is not and was not a minor child and cannot bring a loss of

consortium claim under Kentucky law.

### E

Plaintiffs also are not entitled to punitive damages against any Defendant. Because

Knox County is entitled to sovereign immunity on all of Plaintiffs' state law claims, and

because Defendants Hammons and Hall are entitled to qualified immunity on both the federal

and state law claims, no damages of any kind can be granted, including punitive damages.

Even if immunity were not applicable, however, punitive damages are only available in an

action brought under § 1983 "when the defendant's conduct is shown to be motivated by evil

motive or intent, or when it involves reckless or callous indifference to the federally

protected rights of the plaintiff." *Brown v. Brown*, 46 Fed. App'x. 324, 325 (6th Cir. 2002)

(citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)). As explained above, the Court has found that

the evidence presented does not support a finding that any Defendant acted with deliberate indifference to Goodin's constitutional rights, and there has certainly been no evidence presented of an evil motive or of callous indifference to her rights.[12]  Thus, no reasonable jury could award punitive damages to Plaintiffs on their federal claims.  Punitive damages also cannot be granted on Plaintiffs' state law claims because Plaintiffs have not presented sufficient evidence to support the viability of those claims such that damages of any kind could be awarded.

## F

Finally, the Defendants also move the Court for summary judgment on Plaintiffs' claim for temporary and injunctive relief that would require Defendants to properly train employees in the proper treatment of prisoners, establish guidelines for the treatment of prisoners with medical needs, and to "permanently enjoin[]" Defendants' future conduct. [*See* R. 1 at 14; R. 42 at 13.]  Because the Court finds that Defendants are entitled to summary judgment on all of Plaintiffs' claims, however, the Plaintiffs' request for injunctive relief is moot.  *See, e.g., Rager v. Strode*, 2007 WL 2258864, at *3 (W.D. Ky. Aug. 2, 2007) (holding that because the Court determined the defendant was entitled to summary judgment, the plaintiff's motion for injunctive relief was moot and accordingly should be denied).

## III

Once the party moving for summary judgment has satisfied its burden of showing "an absence of evidence to support the non-moving party's case," *Celotex*, 477 U.S. at 325, the burden shifts to the non-moving party to come forward with specific facts demonstrating the

---

[12] The Court also notes that because Plaintiffs chose not to depose any of the Defendants or any of the jail personnel, it would be particularly difficult for Plaintiffs to present evidence of "willful misconduct" or the "entire want of care which would raise the presumption of a conscious indifference to consequences" required under the standard for punitive damages.  *Smith v. Wade*, 461 U.S. 30, 42-43 (1983) (quoting other sources).

existence of a genuine dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Here, Plaintiffs have not shown that a genuine issue of material fact exists concerning the required elements of any of their claims. Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1.      Defendants' Motion for Summary Judgment [**R. 33**] is **GRANTED** for all federal **and** state claims brought against all Defendants;

2.      In light of the Court's grant of summary judgment to Defendants on all of Plaintiffs' claims, the Plaintiffs' request for declaratory and injunctive relief is denied as moot;

3.      Given the Court's previous denial of Plaintiffs' motion to amend the Complaint [R. 29], the Defendants John Doe(s), as Employees/Officers of Knox County Detention Center, as well as **all** other Defendants in this case**,** are hereby **DISMISSED** from this action;

4.      The Final Pretrial Conference scheduled for **June 30, 2014**, and the Jury Trial scheduled for **July 14, 2014**, are **CANCELLED**;

5.      This is a **FINAL** and **APPEALABLE ORDER** and there is no just cause for delay; and

6.      The Court will enter an appropriate judgment contemporaneously herewith.

This 16th day of June, 2014.



Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**